# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

VIVIAN McGEE,

       Plaintiff,

-vs-

LIEUTENANT JOHN KOWALSKI
and SERGEANT DAVID CLEMENS,

       Defendants.
_____/

CASE NO. 06-CV-10952

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

## OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is a January 17, 2008 Motion to Dismiss and/or for Summary Judgment filed by Defendants Lieutenant John Kowalski and Sergeant David Clemens (collectively "Defendants"). (Doc. No. 49). On February 26, 2008, Plaintiff Vivian McGee ("Plaintiff") filed a Response. The Court held a motion hearing on July 11, 2008. Having considered the entire record, and for the reasons that follow, the Court GRANTS Defendants' motion.

**I.     BACKGROUND**

This case arises from Plaintiff's allegations that she was illegally arrested and detained by City of Royal Oak police officers in connection with an outstanding felony arrest warrant.

On June 14, 2005, Plaintiff was in the process of trying to clear up an outstanding Wayne County felony warrant through the City of Detroit Police Department ("DPD"). (Pl. Br. Ex. A, McGee Dep. 26-42). Plaintiff's sister, for whom the Wayne County warrant was intended, had been improperly using Plaintiff's name. (*Id.* at 24). At the DPD's 13th precinct, Plaintiff was issued a "letter of clearance" – stating that a "name search" of DPD's own records revealed that

1

she had no criminal activity. (McGee Dep. 34-35; Pl. Br. Ex. D, 2005 Clearance Letter). DPD did not take Plaintiff's fingerprints. The Court notes that Detroit is one of many communities in Wayne County. The instant warrant was issued by Wayne County, not the City of Detroit. Plaintiff then called DPD's 8th Precinct, which instructed her that she needed to visit a Michigan State Police post to obtain fingerprints to send to Lansing to clear up the warrant. (McGee Dep. 41).

On July 13, 2005, Plaintiff planned on going to the Michigan State Police post in Oak Park, but got lost on the way. (*Id*. at 42-45). Plaintiff ended up at the Royal Oak Police Department, and went in to ask for directions. (*Id*. at 48). But rather than just ask for directions, Plaintiff approached an officer and explained to him that she was trying to clear her name on some pending criminal charges. (*Id*. at 48-49). The officer took her driver's license, and determined that an individual with her name was the subject of a Wayne County warrant. (*Id*. at 50). When Plaintiff returned from the restroom, officers detained her. (*Id*. at 53). According to Plaintiff, the officers told informed her of the pending criminal charges. (*Id*.). Per Plaintiff, the officers handcuffed Plaintiff, took her up to the third floor, booked her, and then proceeded to discuss Plaintiff's account that the warrant was actually intended for her sister. (*Id*. at 54-57). During the attempt to investigate Plaintiff's claim that the warrant in Plaintiff's name was intended for her sister, the officers placed Plaintiff in a holding cell.

At the time of the incident, Clemens was a patrol sergeant for the Royal Oak Police Department. (Def. Br. Ex. 1, Clemens Dep. 2). Lieutenant Kowalski was the officer in charge. (*Id*. at 6). According to Clemens, Plaintiff came into the Royal Oak Police Station some time between 3:00 p.m. and 4:00 p.m. (*Id*. at 7). After being informed by other officers that Plaintiff

had a felony warrant for her arrest in Wayne County, Clemens approached Plaintiff and asked for her identification. (*Id*. at 8). Before Clemens spoke with her, he summoned Officer Murray and Officer Storye to assist him. (*Id*. at 11). Clemens placed Plaintiff under arrest, and instructed Storye to handcuff Plaintiff for the trip to the-third floor booking area. (Pl. Br. Ex. G, Storye Dep. 10). Officer Catherine Szydlowski handled Plaintiff's booking procedures, and fingerprinted Plaintiff on the station's Automated Fingerprint Identification System ("AFIS"). (Pl. Br. Ex. H, Szydlowski Dep. 11-12).

At that time, Plaintiff told Clemens that she had documents, including a "clearance letter" from the City of Detroit, in her car demonstrating that she was not the person named in the warrant. (Clemens Dep. 15-16). Clemens went out to Plaintiff's car and retrieved a manila folder containing documents, including the DPD clearance letter. (*Id*. at 17).

Clemens testified that the clearance letter indicated that the City of Detroit had run a "name check" in its own internal records, but did not run a LEIN check on Plaintiff. (*Id*. at 24). Clemens then contacted Wayne County to obtain a booking photo of the individual named in the warrant, but Wayne County could not provide one. (*Id*. at 34-36). Plaintiff acknowledged that the officers were attempting to contact Wayne County to obtain a photograph. (McGee Dep. 76). Clemens stated that his "gut" told him that Plaintiff was not the individual sought after in the warrant, but was not convinced that he had enough information to release her. (Clemens Dep. 39-40).

Clemens testified that while he was investigating Plaintiff's situation, he also attended to other duties. (*Id*. at 41). He sent in Plaintiff's AFIS fingerprints to confirm whether there were comparable fingerprints on that system. (*Id*. at 42). Per Clemens' estimation, retrieving

3

fingerprints could take "hours to days." (*Id.* at 43:17). Before the end of Clemens' shift at 11:00 p.m., the fingerprint records came back revealing no record. (*Id.* at 53). Clemens then described what happened next:

> Q: Did you contact anybody at Wayne County to get their authorization to release her?
> A: Yes, I did.
> Q: Explain that one to me.
> A: After receiving [Plaintiff's] fingerprints after they came back as no record I contacted a sergeant I may not pronounce his name property, Krisholow (?) I believe. And spoke to him about [Plaintiff] and the circumstances surrounding her arrest and the the [sic] warrant. I explained the circumstances to him. And he being the agency that was holding the warrant for her arrest, he gave me authorization to release her.
> . . . .
> Q: How soon after after you got that verbal authorization was she released?
> A: As soon as I could get upstairs and release her.

(*Id.* at 56:8-19, 24-25, 57:1).

Before being released, Plaintiff spent a total of eight to ten hours at the Royal Oak Police Station.

On February 9, 2006, Plaintiff filed the instant action in Oakland County Circuit Court against the City of Royal Oak and various individual defendants. On March 2, 2006, Defendants removed the case to federal court on the basis of a federal question.

On July 5, 2007, this Court granted summary judgment to Defendant City of Royal Oak. *McGee v. City of Royal Oak*, No. 06-10952, 2007 WL 2002745, *1-2 (E.D. Mich. July 5, 2007) (unpublished). The Court dismissed Plaintiff's claims under a theory of 42 U.S.C. § 1983 municipal liability, on the ground that Plaintiff was unable to show an unconstitutional "policy, practice, or custom." *Id.* at *3-4. The Court dismissed the state law tort of false imprisonment on

4

the basis of governmental immunity, and intentional infliction of emotional distress on the merits. *Id*. at *4-6.

On June 11, 2007, the Court permitted Plaintiff to amend the Complaint to name the individual police officers. On July 19, 2007, Plaintiff filed a First Amended Complaint,[1] alleging the following Counts against Defendants:

> Count I:     Fourth and Fourteenth Amendment (Due Process & Equal Protection)
> Count II:    False Imprisonment (state law)
> Count III:   Gross Negligence (state law)
> Count IV:    Intentional Infliction of Emotional Distress (state law)

On January 17, 2008, Defendants moved for dismissal and/or for summary judgment on the following grounds: (1) insufficient service of process;[2] (2) qualified immunity on the federal

---

[1] On September 11, 2007, the individual Defendants filed a Motion to Strike the First Amended Complaint. On October 19, 2007, the Magistrate Judge denied in part Defendants' motion – specifically striking paragraph 3 of the Amended Complaint. (Doc. No. 48).

[2] Defendants move for dismissal on the basis on Fed. R. Civ. P. 4(m) on the basis of insufficient service of process Defendants claim that since the April 27, 2007 filing of the Complaint naming both Kowalski and Clemens, Plaintiff has both failed to serve Defendants, also has not shown "good cause" for her failure to serve.

In her brief, Plaintiff responds that: (1) defense counsel indicated that he would file a motion for sanctions if Plaintiff filed an amended complaint; (2) Plaintiff did not serve Defendants due to the "numerous amended complaints" in the case; (3) Defendants had actual notice of the lawsuit; and (4) Defendants have not been prejudiced by the failure to serve.

At oral argument, Plaintiff's counsel represented that Defendants' counsel (not the one representing Defendants at the hearing) had assured him that he could serve the police officer defendants by providing papers to Defendants' counsel's office. Defendants' counsel at oral argument could not confirm or deny whether other counsel made that assurance.

Rule 4(m) states, in relevant part:

> If a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or

claims; and (3) no genuine issue of material fact on the state law claims.

## II. ANALYSIS

### A. Standard for Summary Judgment

The United States Court of Appeals for the Sixth Circuit has summarized the relevant legal standard for a summary judgment motion:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

### B. Qualified Immunity and Due Process Claim under 42 U.S.C. § 1983

When a police officer invokes qualified immunity, the Sixth Circuit has instructed courts to undertake the following analysis:

> When the defendant raises qualified immunity, the plaintiff bears the burden of proving that the defendant is not entitled to summary judgment. Despite this burden of proof, the facts are still viewed in the light most favorable to the plaintiff, who is the non-movant. If there are genuine issues of material fact, [a court] must view them most favorably to the plaintiffs.
> . . . .
> Qualified immunity for a police officer in his individual capacity involves a two-step analysis. "[T]he first inquiry must be whether a constitutional right would have been

---

order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Given the statements in Court, the Court will not grant Defendants' motion on this issue.

6

> violated on the facts alleged." If no constitutional violation occurred, the inquiry is over and summary judgment must be granted to the officer.

*Davenport v. Causey*, 521 F.3d 544, 550 (6th Cir. 2008) (internal citations omitted). If Plaintiff can establish the first prong, then it must be shown that the constitutional right implicated was "clearly established." *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008).

To demonstrate that Plaintiff has not met the first prong, Defendants rely upon the Supreme Court case *Baker v. McCollan*, 443 U.S. 137 (1979), and the Sixth Circuit case *Gray v. Cuyahoga County Sheriff's Department*, 150 F.3d 579 (6th Cir. 1998).

*Baker* is the leading case on the subject of an arrestee's claims of mistaken identity. In *Baker,* the Supreme Court held that where a plaintiff was arrested pursuant to a facially valid warrant and was detained for three days despite his protestations of mistaken identity, the plaintiff's wrongful imprisonment did not state a Fourth Amendment violation. The Court noted that the "Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted – indeed, for every suspect released." *Id*. at 145. Furthermore, it held that "[g]iven the requirements that the arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent." *Id*. at 145-46.

In *Gray*, the Sixth Circuit determined that the principle in *Baker* had its limits. In that case, the plaintiff was ticketed in Ohio for driving without a license and appeared a few weeks later for his sentencing. *Gray*, 150 F.3d at 580. When the officers booked the plaintiff, they discovered that a Michigan state prison had an outstanding parole-violator warrant for an

7

individual with the same name. *Id*. Unbeknownst to the plaintiff, an old acquaintance had been arrested several years prior and had used the plaintiff's identifying materials to the police officers. *Id*. at 581. Hence, the acquaintance was convicted, sentenced, and incarcerated under the plaintiff's name. When the acquaintance failed to appear to a parole officer, an arrest warrant was issued. *Id*.

The plaintiff continuously protested that he was not the person wanted by the Michigan state prison. *Id*. The Michigan state prison sent a "Basic Information Sheet" that included the wanted man's name, birth date, identification, social security numbers, race, sex, height, weight, other physical characteristics, and a photograph. *Id*. at 580. Although the plaintiff matched most of the information contained on the Sheet, he did not resemble the individual in the photograph and lacked certain scars. *Id*.

Six days after the plaintiff was booked in Ohio for being suspected of the individual wanted in Michigan, an Ohio officer contacted the Michigan state prison to obtain copies of the fingerprints of the person identified in the Basic Information Sheet. The Michigan official faxed a copy of the fingerprints and mailed a hard copy to the Ohio official. *Id*. The fingerprints matched those of the plaintiff. *Id*.

The plaintiff continued to protest that he was not the person named in the Michigan warrant. When the plaintiff finally arrived in Michigan almost a month after his detention in Ohio, the Michigan state prison found that the plaintiff's fingerprints did not match those of the individual in the warrant. *Id*. at 581. The mix-up was due to the plaintiff's earlier arrest for receiving stolen property. *Id*. The plaintiff's fingerprints had been sent to the Michigan State Police who in turn had sent those fingerprints to the Ohio officials. *Id*.

8

The plaintiff then filed suit against the Ohio officials for his forty-one (41) day imprisonment. The Court found that the Ohio officials had in their possession: (1) a photograph sent from Michigan that bore no resemblance to the plaintiff; and (2) a physical description of scars that the plaintiff did not have. *Id*. at 582-83. From that, the court stated that a trier of fact could find that the failure of the Ohio officials to ascertain whether they were holding the wrong person was unconstitutional. *Id*. at 583. The court remanded the case for a determination of whether the Ohio officials acted "with something akin to deliberate indifference in failing to ascertain" that the plaintiff was not the person wanted by Michigan authorities. *Id*. The court did not address the issue of a potential qualified immunity defense.

The instant case is a far cry from the situation in *Gray*. Initially, Plaintiff admits here that her initial detention was supported by probable cause. Clemens not only acknowledged Plaintiff's claims of mistaken identity, but took active steps to immediately investigate them. First, Clemens searched Plaintiff's vehicle for the claimed clearance letters, and then discussed them with Plaintiff. Clemens concluded that the City of Detroit letters did not sufficiently demonstrate that there was no valid warrant for Plaintiff's arrest – only that the City of Detroit ran a name check in its own database, and not the LEIN system. He contacted Wayne County. When Wayne County could not provide a photo, Clemens sent Plaintiff's fingerprints through the AFIS to determine whether they matched any on file. Clemens had no control over the pace of the AFIS check. When the AFIS check came back negative, Clemens telephonically communicated with Wayne County and received release authorization, and immediately released Plaintiff.

The court in *Gray* was concerned with the fact that the defendant officers acted "with something akin to deliberate indifference" insofar as the officers had the tools at their immediate disposal to confirm or to deny whether the arrestee was the individual named in the warrant – including a photograph and a physical description. Nothing in the instant case provided Defendants with such obviously exonerating information. *See Kahlich v. City of Grosse Pointe Farms*, 120 F. App'x. 580, 584 (6th Cir. Jan. 10, 2005) (unpublished) (holding that the police officers' detention of a suspect, pending an investigation into the validity of the suspect's clearance letter, was not unreasonable). Moreover, during Plaintiff's eight-to-ten-hour detention, Clemens actively attempted to confirm or to deny Plaintiff's story.

Even if the instant facts stated a constitutional violation, the Court finds that Plaintiff has not established that the relevant violation was "clearly established." Plaintiff puts much weight on the fact that Clemens discounted the clearance letters, and felt that the situation required additional investigation before releasing Plaintiff. Plaintiff points to no Supreme Court or Sixth Circuit authority that has held that a city's clearance letter based upon a run of its own database, and not the LEIN, constitutes presumptive evidence of exoneration when officers are faced with a valid felony arrest warrant and mistaken identity claims.

On these facts, the Court finds that Plaintiff has failed to demonstrate a due process constitutional deprivation under § 1983.Therefore, the Court GRANTS summary judgment to Defendants on Plaintiff's Fourth Amendment claim.

### C. Equal Protection Claim

Defendants contend that Plaintiff has failed to establish a Fourteenth Amendment Equal Protection claim, since she has failed to identify similarly-situated individuals from whom she

has been treated differently. Plaintiff responds that Kowalski testified that not all persons entering the station with an arrest warrant were actually arrested.

> The Sixth Circuit has noted:
>
> "The Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures." Similarly, the Supreme Court, in *Whren v. United States,* confirmed that an officer's discriminatory motivations for pursuing a course of action can give rise to an Equal Protection claim, even where there are sufficient objective indicia of suspicion to justify the officer's actions under the Fourth Amendment[.]
> . . . .
> The Supreme Court has explained that a claimant alleging selective enforcement of facially neutral criminal laws must demonstrate that the challenged law enforcement practice "had a discriminatory effect and that it was motivated by a discriminatory purpose." "To establish discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." A claimant can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated or through the use of statistical or other evidence which "address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." Discriminatory purpose can be shown by demonstrating that the "'decisionmaker . . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.'" Determining whether official action was motivated by intentional discrimination "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another."

*Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533-34 (6th Cir. 2002) (internal citations and footnote omitted).

Even taking Kowalski's testimony at face value, Plaintiff has not produced any individuals, or statistical evidence, that addresses that Defendants treated blacks differently from another class of similarly-situated individuals.

Therefore, the Court GRANTS summary judgment on Plaintiff's Equal Protection claim.

11

### D. State Law Claims

Plaintiff further asserts state law claims of false imprisonment, gross negligence, and intentional infliction of emotional distress against the individual defendants.

The Supreme Court has recognized that in cases involving allegations of mistaken identity, that a claim of false imprisonment, whether it be asserted as a 42 U.S.C. § 1983 or a state law tort, is a separate inquiry than the due process claim discussed above. *Baker*, 443 U.S. at 145.

The Michigan Court of Appeals has summarized the relevant law pertaining to the intentional tort of false imprisonment:

> False imprisonment has been defined by this Court as an unlawful restraint on a person's liberty or freedom of movement. . . . To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause. If the arrest was legal, there has not been a false arrest or a false imprisonment. Whether the plaintiff could actually have been convicted is irrelevant because actual innocence is not an element of false arrest.

*Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 17-18 (2003) (internal citations omitted).

Here, there is no genuine issue of material fact as to whether the individual defendants had probable cause to detain Plaintiff. Plaintiff's name matched that of an individual for which an arrest warrant had been issued by Wayne County. *See Kahlich*, 120 F. App'x at 583-86 (holding that probable cause existed the officers made an arrest pursuant to a facially valid warrant, and that the officers did not have an immediate duty to resolve the claim of mistaken identity). Indeed, Plaintiff's counsel acknowledged at oral argument that Defendants' initial seizure of Plaintiff was justified.

In regard to Plaintiff's gross negligence claim, Michigan courts have generally recognized that police officers acting with probable cause are not grossly negligent for arresting the wrong individual due to mistaken identity. *Bell v. Fox*, 206 Mich. App. 522, 525 (1994); *Hojeije v. Dep't of Treasury*, 263 Mich. App. 295, 310 (2004) (extending the rule to searches and seizures).

Finally, this Court has addressed the merits of Plaintiff's IIED claim in its previous order:

> The City argues that the threshold for showing extreme and outrageous conduct is high. It contends that during the eight to ten hours Plaintiff was in the holding cell, they investigated her claim that she was not the individual sought in the warrant, but had to rely on other agencies to provide them with information. The City asserts that they were not responsible for any delay in comparing photographs and fingerprints.
>
> Plaintiff responds that it was extreme and outrageous conduct to dismiss an official "clearance" letter. Plaintiff avers that disregarding the letter was intentional or reckless. Plaintiff contends that she suffered severe emotion distress as she waited for fingerprints, which normally can be returned in a hour.
>
> The elements of IIED are: (1) extreme or outrageous conduct, (2) which intentionally or recklessly, (3) causes (4) extreme emotional distress. "Extreme or outrageous conduct has further been defined as conduct so outrageous in character and so extreme in degree that it goes beyond all possible bounds of decency and is regarded as atrocious and utterly intolerable in a civilized community."
>
> The Court finds that the officers' action of placing Plaintiff in a holding cell for eight to ten hours while they investigated her outstanding warrant was not outrageous or extreme conduct. In a light most favorable to Plaintiff, Defendants' actions do not rise to the level of conduct considered beyond decency. Thus, there is no genuine issue of material fact. Accordingly, the Court GRANTS the City's Motion for Summary Judgment on Plaintiff's IIED claim.

*McGee,* 2007 WL 2002745, at *5-6. That reasoning applies here, as well.

Therefore, the Court GRANTS summary judgment to Defendants on Plaintiff's state law claims.

## III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment. This Order closes the instant case.

**SO ORDERED.**

                                            s/Paul D. Borman
                                            PAUL D. BORMAN
                                            UNITED STATES DISTRICT JUDGE

Dated: July 14, 2008

### CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on July 14, 2008.

                                            s/Denise Goodine
                                            Case Manager